SEND

ENTER

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JENNY NEGRETE, | ) | No. EDCV 05-0907-RC |
| | ) | |
| Plaintiff, | ) | |
| | ) | OPINION AND ORDER |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Plaintiff Jenny Negrete filed a complaint on September 28, 2005, seeking review of the Commissioner's decision denying her application for disability benefits. The Commissioner answered the complaint on January 30, 2006, and the parties filed a joint stipulation on May 11, 2006.

**BACKGROUND**

**I**

On June 3, 2002, plaintiff applied for disability benefits under

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Michael J. Astrue is substituted as the defendant in the action.

Title II of the Social Security Act ("the Act"), 42 U.S.C. § 423, claiming an inability to work since April 19, 2002, due to pain in the neck, back and left knee and carpal tunnel syndrome. Certified Administrative Record ("A.R.") 64-66, 107.[2]  The plaintiff's application was denied initially on August 26, 2002, and was denied again on December 27, 2002, following reconsideration.  A.R. 46-54. The plaintiff then requested an administrative hearing, which was held before Administrative Law Judge Helen E. Hesse ("the ALJ") on February 17, 2004.  A.R. 55, 439-90.  On April 23, 2004, the ALJ issued a decision finding plaintiff is not disabled.  A.R. 15-25.  The plaintiff appealed this decision to the Appeals Council, which denied review on August 25, 2005.  A.R. 5-14.

**II**

The plaintiff, who was born on May 1, 1951, is currently 56 years old.  A.R. 61, 64, 442.  She has an eleventh-grade education and has previously worked as an assembler, warehouse worker, quality control inspector, and customer service/clerical worker.  A.R. 93, 98, 108, 113, 116-23.

Between August 20, 1998, and March 20, 2003, plaintiff received treatment at Loma Linda University Medical Center, where she was diagnosed with depression, hypertension, migraine headaches, vertigo, and other conditions.  A.R. 137-52, 254-95, 396-99.  On April 15,

---

[2] Plaintiff previously filed an application for Title II benefits on June 26, 2000 (protective filing date), which was denied on October 19, 2000, and not further pursued by plaintiff. A.R. 40-43, 60-63.

2

1999, Brent Kay, M.D., diagnosed plaintiff with right fifth toe pain at the base and a possible stress or avulsion fracture, and recommended plaintiff continue weight loss efforts, avoid all weight bearing activity as much as possible, and increase exercise cycling. A.R. 295.  Right foot x-rays taken April 15, 1999, showed a chronic 4-mm. bony prominence in the fifth toe and minimal degeneration of the middle and distal phalangeal joints.  A.R. 292.  Right foot x-rays taken July 11, 2000, revealed a .3-cm. bony spur extending laterally from the middle phalanx of the right fifth toe, and minimal narrowing of the proximal and distal interphalangeal joint spaces.  A.R. 280-81. On February 27, 20002, plaintiff underwent electromyography ("EMG") and nerve conduction velocity studies ("NCV") of both arms, which were borderline for median neuropathies[3] at the wrists, with minimal carpal tunnel syndrome, but there was no suggestion of radiculopathy.[4]  A.R. 262-65.

On October 6, 2000, Venkata Pulakanti, M.D., an internist, examined plaintiff and diagnosed her with a lumbosacral muscle strain and negative straight leg raising, morbid obesity, bilateral knee degenerative joint disease with positive McMurray's sign on the left knee, and other conditions.  A.R. 153-57.  Dr. Pulakanti opined plaintiff can lift and carry 20 pounds occasionally and 10 pounds

---

[3]  Neuropathy is "a functional disturbance or pathological change in the peripheral nervous system, sometimes limited to noninflammatory lesions as opposed to those of neuritis; the etiology may be known or unknown."  Dorland's Illustrated Medical Dictionary at 1212.

[4]  Radiculopathy is "disease of the nerve roots."  Id. at 1511.

3

1 frequently, and can walk, stand and sit for up to 6 hours in an 8-hour
2 workday with appropriate breaks.  A.R. 157.

4     Between January 15, 2002, and January 20, 2004, Brad A. Katzman,
5 D.P.M., treated plaintiff for exostosis,[5] and also diagnosed her as
6 having osteoarthritic changes around the toe.  A.R. 400-01, 412, 414-
7 15, 422-24.  On January 7, 2004, plaintiff had a bilateral lower
8 extremity arterial Doppler examination, which showed complete occlusion
9 of the left common femoral and superficial femoral arteries, with
10 reconstitution of the left popliteal artery, and atherosclerotic
11 disease in the right superficial femoral and popliteal arteries, but no
12 hemodynamically significant stenosis[6] on the right.  A.R. 403, 418.  A
13 right foot MRI taken January 9, 2004, showed mild osteoarthritic
14 changes involving the great toe, including the first metatarsophalan-
15 geal joint and the tarsal-metatarsal joint.  A.R. 402.  On February 16,
16 2004, Dr. Katzman opined plaintiff:  would need to rest 4-6 hours out
17 of an 8-hour day; can repetitively lift and carry up to 5 pounds; can
18 reach on a sustained daily basis; cannot repetitively grasp, push, pull
19 or perform fine manipulation with her upper arms or use her legs to
20 repetitively push and pull; should avoid exposure to unprotected
21 heights, moving machinery, and driving; and would not have been able to
22 maintain adequate attendance at any job since her alleged disability
23 began.  A.R. 401.

---

[5] An exostosis is "a benign bony growth projecting outward from the surface of a bone."  Dorland's Illustrated Medical Dictionary at 634.

[6] Stenosis is "an abnormal narrowing of a duct or canal." Dorland's Illustrated Medical Dictionary at 1698.

4

1        On March 22, 2002, Scott Goldman, M.D., examined plaintiff and
2   diagnosed her with a lumbar strain, rule out a herniated disc.  A.R.
3   203-04, 342-43, 421.  That same day, plaintiff had lumbar spine x-
4   rays, which showed mild degenerative disc disease.  A.R. 244, 392.  On
5   March 25, 2002, plaintiff had a lumbar spine MRI, which showed mild
6   bilateral disc bulges at L5-S1, without significant spinal or
7   foraminal stenosis.  A.R. 193, 243, 391.  On April 19, 2002, Dr.
8   Goldman diagnosed plaintiff with left knee internal derangement, A.R.
9   202, 340; however, left knee x-rays were normal.  A.R. 238, 386.  On
10  May 13, 2002, Dr. Goldman diagnosed plaintiff with left hand carpal
11  tunnel syndrome and a right middle finger contusion.  A.R. 200, 337.
12  That same day, plaintiff underwent cervical spine x-rays, which showed
13  degenerative disc disease with osteoarthritic spurs.  A.R. 236, 384.
14  Cervical spine x-rays taken May 17, 2002, showed a slight loss of
15  intervertebral disc height at C5-C6, with minimal degenerative
16  changes.  A.R. 191, 235, 383.  On October 14, 2002, Dr. Goldman
17  diagnosed plaintiff with right shoulder bursitis.  A.R. 196, 332.
18
19       A left knee MRI taken June 19, 2002, showed a horizontal tear of
20  the body of the medial meniscus, a tiny radial tear of the posterior
21  horn of the lateral meniscus, edema along the lateral joint line, and
22  medial compartment osteoarthritis.  A.R. 231, 379.  On November 26,
23  2002, Dr. Goldman performed a partial medial and partial lateral
24  meniscectomy to repair lateral and medial meniscal tears in
25  plaintiff's left knee.  A.R. 212-13, 356-57.  On December 30, 2002,
26  Dr. Goldman noted plaintiff continued to have some inflammation and
27  weakness in her left knee postoperatively.  A.R. 327.  On
28  September 10, 2003, Dr. Goldman diagnosed plaintiff with osteoarthri-

tis of both knees after x-rays showed osteoarthritic changes in both knees. A.R. 317, 375. On December 15, 2003, Dr. Goldman diagnosed plaintiff with a cervical strain with right-sided radiculopathy and left knee osteoarthritis. A.R. 316. On February 13, 2004, Dr. Goldman diagnosed plaintiff with knee osteoarthritis, chondromalacia patella,[7] cervical spondylosis[8] and radiculopathy, a lumbar herniated nucleus pulposis with left-sided radiculopathy, degenerative joint disease and shoulder impingement syndrome and opined plaintiff needs 4-6 hours of rest during an 8-hour day, she should do no lifting, she cannot use her arms or legs for repetitive activities, she should not work at unprotected heights or around moving machinery, and she should not drive. A.R. 394-95. Dr. Goldman also opined plaintiff would not have been able to maintain adequate attendance at any job since her alleged disability began. A.R. 395.

On May 24, 2002, James I. Rho, M.D., examined plaintiff and diagnosed her with lower back pain with bilateral radiculopathy, a herniated nucleus pulposus at L5-S1, left knee pain and left cervical radiculopathy, among other conditions. A.R. 248-51, 318-21. On June 13 and November 7, 2002, Dr. Rho gave plaintiff lumbar epidural steroid injections, A.R. 209-11, 214-16, 353-55, 358-60; however, Dr. Rho subsequently noted that the two injections did not help plaintiff significantly. A.R. 347.

---

[7] Chondromalacia is "softening of the articular cartilage, most frequently in the patella." Dorland's Illustrated Medical Dictionary at 344.

[8] Spondylosis is "a general term for degenerative changes due to osteoarthritis." Dorland's Illustrated Medical Dictionary, 1684 (29th ed. 2000).

6

On May 1, 2003, Jose Rodriguez, M.D., examined plaintiff and diagnosed her with cervical radiculopathy and possible carpal tunnel syndrome, moderate to severe lower back pain with intermittent left lumbar radiculopathy, obesity, and degenerative joint disease. A.R. 310-11. On May 20, 2003, plaintiff had a cervical spine MRI, which revealed mild degenerative changes with slight narrowing of the disc spaces and some degenerative changes in the facet joints at C4-C5 and C5-C6 and a slight narrowing of the neural foramen at C5-C6. A.R. 312. On September 10, 2003, plaintiff underwent EMG/NCV studies of the upper extremities, which were abnormal, showing median nerve compression neuropathy at the wrist (as seen in mild carpal tunnel syndrome) and mild-to-moderate ulnar nerve compressive neuropathy at the right elbow. A.R. 300-02. On September 16, 2003, Dr. Rodriguez reexamined plaintiff, diagnosed her with mild cervical spondylosis and radiculopathy, left mild carpal tunnel syndrome and right ulnar neuropathy, moderate to severe lower back pain with intermittent left lumbar radiculopathy, obesity and degenerative joint disease and recommended against cervical or lumbar spine surgery, while noting weight loss would be very helpful and plaintiff might need future surgery for her compressive peripheral neuropathy. A.R. 298-99.

On February 2, 2004, Wallace C. Grosney, M.D., examined plaintiff and diagnosed her with bilateral femoropopliteal arteriosclerosis obliterans,[9] left greater than right. A.R. 413, 416-17.

---

[9] Arteriosclerosis obliterans is "thickening and loss of elasticity of arterial walls . . . in which proliferation of the intima of small vessels has caused obliteration of the lumen [the cavity or channel within a tube or tubular organ]." Dorland's Illustrated Medical Dictionary, 140, 1030 (29th ed. 2000).

Medical expert Joseph E. Jensen, M.D., testified at the administrative hearing. He opined that plaintiff is post-arthroscopy and has a cervical strain, with a minimal degree of degenerative disc disease at C5-C6 and some right-sided radiculopathy but without evidence of nerve entrapment, and left knee degenerative joint disease. A.R. 449-55, 478-85. Dr. Jensen further opined plaintiff: should be limited to lifting and carrying up to 20 pounds occasionally and 10 pounds frequently and standing and/or walking for 2 hours out of an 8-hour day with unlimited sitting; should be able to stand or sit, stretch and move about for 1-2 minutes after each hour of standing or sitting; can occasionally climb stairs and ramps, but not ladders, ropes or scaffolding; can balance, bend, squat and partially kneel, but cannot crawl; can frequently perform fine fingering, feeling, grasping and gripping; can only occasionally reach with her right arm above shoulder level; should avoid hazardous heights and concentrated exposure to extreme cold; and should not walk on extremes of irregular ground. A.R. 454.

**DISCUSSION**

**III**

The Court, pursuant to 42 U.S.C. § 405(g), has the authority to review the Commissioner's decision denying plaintiff disability benefits to determine if his findings are supported by substantial evidence and whether the Commissioner used the proper legal standards in reaching his decision. Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007); Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006).

//

1    The claimant is "disabled" for the purpose of receiving benefits
2 under the Act if she is unable to engage in any substantial gainful
3 activity due to an impairment which has lasted, or is expected to
4 last, for a continuous period of at least twelve months.  42 U.S.C. §
5 423(d)(1)(A); 20 C.F.R. § 404.1505(a).  "The claimant bears the burden
6 of establishing a prima facie case of disability."  Roberts v.
7 Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122
8 (1996); Smolen v. Chater, 80 F.3d 1273, 1289 (9th Cir. 1996).  In this
9 case, since plaintiff's disability insured status expired on June 30,
10 2002,[10] A.R. 23, she must prove she was either permanently disabled or
11 subject to a condition which became so severe as to disable her prior
12 to that date.  Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998);
13 Armstrong v. Comm'r of the Soc. Sec. Admin., 160 F.3d 587, 589 (9th
14 Cir. 1998).

16    The Commissioner has promulgated regulations establishing a five-
17 step sequential evaluation process for the ALJ to follow in a
18 disability case.  20 C.F.R. § 404.1520.  In the **First Step**, the ALJ
19 must determine whether the claimant is currently engaged in
20 substantial gainful activity.  20 C.F.R. § 404.1520(b).  If not, in
21 the **Second Step**, the ALJ must determine whether the claimant has a
22 severe impairment or combination of impairments significantly limiting
23 her from performing basic work activities.  20 C.F.R. § 404.1520(c).
24 If so, in the **Third Step**, the ALJ must determine whether the claimant
25 has an impairment or combination of impairments that meets or equals

---

27    [10]  The plaintiff does not challenge the ALJ's determination
28 that she last met the disability insured status requirements on
June 30, 2002.

1  the requirements of the Listing of Impairments ("Listing"), 20 C.F.R.
2  § 404, Subpart P, App. 1.  20 C.F.R. § 404.1520(d).  If not, in the
3  **Fourth Step**, the ALJ must determine whether the claimant has
4  sufficient residual functional capacity despite the impairment or
5  various limitations to perform her past work.  20 C.F.R. §
6  404.1520(f).  If not, in **Step Five**, the burden shifts to the
7  Commissioner to show the claimant can perform other work that exists
8  in significant numbers in the national economy.  20 C.F.R. §
9  404.1520(g).

   Applying the five-step sequential evaluation process, the ALJ found plaintiff has not engaged in substantial gainful activity since the alleged onset of disability.  (Step One).  The ALJ then found plaintiff's "cervical strain with minimal degenerative disc disease at C5-6, with radiculopathy on [the] right without nerve entrapment, morbid obesity, and degenerative joint disease left knee, status post arthroscopy[,] are considered 'severe'" impairments (Step Two); however, she does not have an impairment or combination of impairments that meets or equals a Listing.  (Step Three).  The ALJ next determined plaintiff cannot perform her past relevant work.  (Step Four).  Finally, the ALJ found plaintiff can perform a significant number of jobs in the national economy; therefore, she is not disabled.  (Step Five).

**IV**

A claimant's residual functional capacity ("RFC") is what she can still do despite his physical, mental, nonexertional, and other limitations.  Mayes v. Massanari, 276 F.3d 453, 460 (9th Cir. 2001);

Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). Here, the ALJ found plaintiff retains the following RFC:

> [S]he can sit without restrictions. She can stand and walk 2 hours in an 8[-]hour day, changing positions briefly every hour. She can lift and carry 20 pounds occasionally, 10 pounds frequently. She can occasionally climb stairs, bend, balance, stoop, partially kneel, and crouch. She should not climb ladders or scaffolds or crawl. She can frequently perform fine and gross manipulation. She is limited to occasional over-shoulder work with the right upper [arm]. She should avoid unprotected heights, dangerous machinery and fast[-]moving machinery. She should avoid concentrated exposure to extreme cold. She should avoid jobs requiring hypervigilance, safety operations of others, and high production quota or rapid assembly. A moderate pace is okay.

A.R. 24. However, plaintiff contends the ALJ's RFC assessment is not supported by substantial evidence for several reasons, including the ALJ's improper rejection of her testimony.[11] The plaintiff is correct.

The plaintiff testified at the administrative hearing that she

---

[11] The plaintiff also claims the ALJ failed to properly consider her husband's testimony and erroneously rejected the opinions of her treating physicians, Drs. Katzman and Goldman. The Court need not reach these claims in light of the decision herein.

has headaches, dizziness, chronic neck pain and numbness radiating into her shoulder, back pain that causes numbness radiating through her left leg, chest pain, left knee and right foot pain, right hand problems, and acid reflux.  A.R. 444, 460-62, 467-68, 471-73.  She further testified she cannot sit for long because of her back pain, and has to shift positions every 10-20 minutes, her left knee and right foot start to hurt her if she stands for 10-20 minutes, she cannot squat, and she has difficulty walking and can only walk 15-20 minutes at a time and uses a cane to walk.  A.R. 444, 447-48, 466-69.  The plaintiff also stated her legs swell up and 4-5 times a day she needs to elevate her legs for 1-2 hours and put ice on them, and she needs to lie down 30-40 minutes out of every hour.  A.R. 470.  The plaintiff testified the joints in her fingers hurt and she has trouble picking up objects.  A.R. 473.  Further, plaintiff stated she becomes dizzy due to pain and she takes hydrocodone (Vicodin) for the pain that makes her drowsy and makes it difficult for her to focus or concentrate.[12]  A.R. 445-47, 460, 471-76.

Once a claimant has presented objective evidence that she suffers from an impairment that could cause pain or other nonexertional

//

---

[12] During the administrative hearing, the ALJ became impatient with plaintiff's counsel regarding the manner in which she was questioning plaintiff, and told counsel she could "submit [plaintiff's] statement signed under penalty of perjury."  A.R. 476-77.  For this reason, plaintiff submitted declarations to the ALJ and the Appeals Council.  A.R. 405-08, 434-38.  These declarations largely reiterate, clarify and amplify statements plaintiff made at the administrative hearing, ibid., and also discuss conditions plaintiff did not address at the administrative hearing.  A.R. 405-06.

limitations,[13] the ALJ may not discredit the claimant's testimony "solely because the degree of pain alleged by the claimant is not supported by objective medical evidence." Bunnell v. Sullivan, 947 F.2d 341, 347 (9th Cir. 1991) (en banc); Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004). Thus, if the ALJ finds the claimant's subjective complaints are not credible, she "'must provide specific, cogent reasons for the disbelief.'" Greger v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006) (citations omitted); Moisa, 367 F.3d at 885. Furthermore, if there is medical evidence establishing an objective basis for some degree of pain and related symptoms, and no evidence affirmatively suggesting the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Morgan v. Comm'r of the Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999); Parra, 481 F.3d at 750 (9th Cir. 2007).

The ALJ provided several reasons for rejecting plaintiff's testimony. First, the ALJ stated "[t]here is no credible evidence of regular usage of strong medication to alleviate pain that would significantly impair the [plaintiff's] ability to do basic work activities." A.R. 21. Although an ALJ may properly consider a claimant's failure to take prescription pain medication in finding the pain is not as severe as she claims, see, e.g., Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995) (per curiam) (upholding an ALJ's negative credibility determination that relied, in part, on the

---

[13] "While most cases discuss excess pain testimony rather than excess symptom testimony, rules developed to assure proper consideration of excess pain apply equally to other medically related symptoms." Swenson v. Sullivan, 876 F.2d 683, 687-88 (9th Cir. 1989).

13

claimant's failure to require prescription pain medication), the record here shows plaintiff has consistently been prescribed strong pain and anti-inflammatory medications, including Celebrex,[14] Darvocet,[15] Ibuprofen 800 mg.,[16] Vicodin/Anexsia,[17] and Vioxx.[18] See, e.g., A.R. 195-96, 200, 202, 271, 275, 277, 291, 327, 329, 331-32, 337. Therefore, this is not a valid reason, let alone a clear and convincing reason, for finding plaintiff was not credible.

The ALJ's adverse credibility determination also was based on her

---

[14] "Celebrex relieves the pain and inflammation of osteoarthritis and rheumatoid arthritis." The PDR Family Guide to Prescription Drugs, 124 (8th ed. 2000).

[15] Darvocet is a "mild narcotic analgesic[] prescribed for the relief of mild to moderate pain, with or without fever." Id. at 177.

[16] Ibuprofen "is a nonsteroidal anti-inflammatory drug available in both prescription and nonprescription forms." Id. at 317, 426. Over-the-counter medications such as Advil, Motrin and Nuprin contain 200 mg. of ibuprofen, See Physicians' Desk Reference for Nonprescription Drugs, 641, 677, 828-29 (19th ed. 1998); whereas, plaintiff, in contrast, was prescribed 800 mg. ibuprofen. A.R. 277. "Prescription [ibuprofen] is used in adults for relief of the symptoms of rheumatoid arthritis and osteoarthritis, treatment of menstrual pain, and relief of mild to moderate pain." The PDR Family Guide to Prescription Drugs at 317, 426.

[17] Vicodin and Anexsia are brand names of hydrocodone, and are used "for the relief of moderate to moderately severe pain." Id. at 41, 723.

[18] "Vioxx [was] . . . used in the treatment of osteoarthritis, painful menstruation (dysmenorrhea), and other types of acute pain." Id. at 728. Vioxx was withdrawn from the market effective September 30, 2004. See U.S. Food and Drug Administration, FDA News, P04-95 (September 30, 1994), *available at*, (http://www.fda.gov/bbs/topics/news/2004/NEW01122.html) (last visited July 27, 2007).

14

finding that "[t]here was no evidence in the medical record of any significant [medication] side effects." A.R. 21. This is also not true. Rather, plaintiff testified hydrocodone (Vicodin) makes her drowsy and makes it difficult for her to focus or concentrate, A.R. 445-47, 460, 471-76, and the medical record reflects plaintiff's repeated complaints of dizziness. See, e.g., A.R. 149-50, 259-60, 275. Thus, this also is not a valid reason, let alone a clear and convincing reason, for finding plaintiff was not credible.[19]

The ALJ also rejected plaintiff's excess pain testimony on the ground plaintiff "does not require any assistive device for ambulation." A.R. 21. However, this finding also is contradicted by the record and plaintiff's testimony. Specifically, Dr. Goldman provided plaintiff with a cane to help her walk, A.R. 327, and plaintiff testified she requires a cane to walk. A.R. 466-67. Therefore, this, too, is not a valid reason, let alone a clear and convincing reason, for finding plaintiff was not credible.

---

[19] Moreover, the ALJ must consider all factors that might have a significant impact on an individual's ability to work, including the side effects of medication, Erickson v. Shalala, 9 F.3d 813, 817-18 (9th Cir. 1993), which "can be a 'highly idiosyncratic phenomenon' and a claimant's testimony as to their limiting effects should not be trivialized." Varney v. Sec'y of Health & Human Servs., 846 F.2d 581, 585 (9th Cir. 1988). Thus, when a claimant testifies she is experiencing a side effect known to be associated with a particular medication, the ALJ may disregard the testimony only if she "support[s] that decision with specific findings similar to those required for excess pain testimony, as long as the side effects are in fact associated with the claimant's medication(s)." Id. Dizziness, drowsiness, and decreased mental capabilities are all potential side effects of hydrocodone. The PDR Family Guide to Prescription Drugs at 723. Therefore, the ALJ erred in failing to properly consider plaintiff's drowsiness and dizziness.

1    Furthermore, the ALJ opined plaintiff "exhibited no evidence of
2 diffuse atrophy or muscle wasting, common indicators of chronic pain."
3 A.R. 21.  However, the absence of atrophy or muscle wasting on
4 plaintiff provides no basis for rejecting plaintiff's excess pain
5 testimony.  See Miller v. Sullivan, 953 F.2d 417, 422-23 (8th Cir.
6 1992) ("[A]lthough muscle deterioration may result from disuse,
7 disabling pain does not always result in muscle disuse.  Therefore,
8 the ALJ cannot discount Miller's claim simply because she does not
9 show an effect that other people suffering from disabling pain may
10 show.").

12    The ALJ further rejected plaintiff's pain complaints because
13 "[a]t the hearing, the [plaintiff's] thoughts did not seem to wander
14 and all questions were answered alertly and appropriately."  A.R. 21.
15 This finding, though, provides little support for the ALJ's negative
16 credibility determination.  See Gallant v. Heckler, 753 F.2d 1450,
17 1455 (9th Cir. 1984) ("The fact that a claimant does not exhibit
18 physical manifestations of prolonged pain at the hearing provides
19 little, if any, support for the ALJ's ultimate conclusion that the
20 claimant is not disabled or that his allegations of constant pain are
21 not credible.").

23    Finally, the ALJ found the medical record did not fully support
24 plaintiff's pain complaints, stating:

26    [T]he [plaintiff] maintains she is unable to work due to her
27    alleged subjective symptoms.  However, the undersigned notes
28    the [plaintiff] has not established a medically determinable

16

| | |
|---|---|
| 1 | impairment which would reasonably be expected to produce |
| 2 | such limitations.  Indeed, her radiographs have consistently |
| 3 | shown essentially mild findings.  Here electrodiagnostic |
| 4 | testing has not revealed any significant problems.  The |
| 5 | [plaintiff] has not required any extended periods of |
| 6 | hospital confinement, emergency room treatment, use of a |
| 7 | TENS unit, participation in a pain control clinic or other |
| 8 | extensive or significant forms of treatment commonly |
| 9 | prescribed for intense pain. |

A.R. 21.  However, "[t]he fact that a claimant's testimony is not fully corroborated by the objective medical findings, in and of itself, is not a clear and convincing reason for rejecting it." Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001); see also Cotton v. Bowen, 799 F.2d 1403, 1407 (9th Cir. 1986) ("It is improper as a matter of law to discredit excess pain testimony solely on the ground that it is not fully corroborated by objective medical findings.").  Moreover, the ALJ's citation to the medical record is incomplete and, in some case, incorrect.  For instance, a Doppler examination of plaintiff's lower legs revealed complete occlusion of the left common femoral and superficial femoral arteries.  A.R. 403, 418.  Moreover, plaintiff was referred to Dr. Rho for pain management, and she received several epidural injections from him.  A.R. 209-11, 214-16, 223-25, 248-51, 318-21, 347, 353-55, 358-60, 367-69.

In short, "the ALJ provided unsatisfactory reasons for discounting [plaintiff's] credibility, and . . . [her] findings were unsupported by substantial evidence based on the record as a whole."

1 Reddick v. Chater, 157 F.3d 715, 724 (9th Cir. 1998).

**V**

This Court has the discretion to award disability benefits to a plaintiff when there is no need to remand the case for additional factual findings. McCartey v. Massanari, 298 F.3d 1072, 1076 (9th Cir. 2002); Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001). "[W]here the record has been developed fully and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits." Benecke v. Barnhart, 379 F.3d 587, 593 (9th Cir. 2004).

"[W]here the ALJ improperly rejects the claimant's testimony regarding [her] limitations, and the claimant would be disabled if [her] testimony were credited, . . . that testimony is . . . credited as a matter of law." Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995); see also Benton v. Barnhart, 331 F.3d 1030, 1041 (9th Cir. 2003) (ALJ did not set forth clear and convincing reasons for rejecting plaintiff's subjective complaints, and "given [plaintiff's] obvious serious physical impairments, [her] claim of pain and physical limitations should have been credited."). Here, vocational expert Alan L. Ey testified that an individual with the limitations described by plaintiff would be unable to perform any substantial gainful

//
//
//
//
//

activity. A.R. 488. Therefore, properly crediting plaintiff's testimony, she is disabled and entitled to Title II benefits.

**ORDER**

IT IS ORDERED that plaintiff's request for relief be granted, and the Commissioner shall award Title II disability benefits to plaintiff under 42 U.S.C. § 423.

DATE: July 30, 2007     /s/ Rosalyn M. Chapman
                        ROSALYN M. CHAPMAN
                        UNITED STATES MAGISTRATE JUDGE

R&R-MDO\05-0907.MDO
7/30/07